Renate "Irene" HEARN and Betty Kendrick, Plaintiffs,

v.

GENERAL ELECTRIC COMPANY, Defendant.

Civil Action No. 93–T–424–S.

United States District Court, M.D. Alabama, Southern Division.

June 3, 1996.

Julian L. McPhillips, Jr., McPhillips, Shinbaum, Gill & Stoner, Montgomery, AL, Sherrod Judson Waites, II, Office of Gaeton L. Drexinger, Marietta, GA, for Renate "Irene" Hearn, Betty Kendrick and William Richards.

Richard H. Gill, John Fairley McDonald, III, Copeland, Franco, Screws & Gill, P.A., Montgomery, AL, for General Electric Company and Al Veres.

## MEMORANDUM OPINION

MYRON H. THOMPSON, Chief Judge.

Plaintiffs Renate "Irene" Hearn and Betty Kendrick have brought this lawsuit claiming that defendant General Electric Company, also known as GE, illegally discriminated against them because they are women. Hearn claims that GE laid her off, and Kendrick claims that the company demoted her, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17 (West 1994).[1] They have properly invoked the jurisdiction of the court pursuant to 42 U.S.C.A. § 2000e–5(f)(3) (West 1994). They seek injunctive relief, compensatory and punitive damages, and attorney's fees and expenses. Based on the evidence presented, the court finds in favor of Hearn and Kendrick and against GE.[2]

## I. BACKGROUND

GE operates a plant in Dothan, Alabama. The plant employs over 200 people and manufactures electric motors for industrial and commercial use.[3] GE pays plant employees in three different ways. "Non-exempt hourly" employees are paid hourly wages and are covered by the minimum wage and maximum hours provisions of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C.A. §§ 201–219 (West 1978 & Supp.1996). "Non-exempt salaried" employees are paid weekly salaries but are covered by the Act. "Exempt salaried" employees are paid weekly salaries and are exempt from the Act. Most management and professional positions fall into this third category.[4] From time to time, GE supplements its workforce with persons

---

1. Al Veres, GE's manager at its plant in Dothan, Alabama, was initially named as well as a defendant in this lawsuit. By order entered on October 15, 1993, he was dismissed because he could not be sued in his individual capacity under Title VII, *Smith v. Capitol City Club of Montgomery*, 850 F.Supp. 976 (M.D.Ala.1994) (Thompson, J.), and because he was an unnecessary party in his official capacity under Title VII since GE was already a named defendant.

2. Hearn and Kendrick, joined by plaintiff William Robert Richards, also charged GE with age discrimination in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C.A. §§ 621–634 (West 1985 & Supp. 1996). Richards is also known as Bob Richards. Jury trial transcript, filed April 12, 1994, vol. III, at 166.

   Hearn's, Kendrick's, and Richards's age-discrimination claims, along with Hearn's and Kendrick's gender-discrimination claims, were tried before a jury in November 1993. The jury found against Hearn, Kendrick, and Richards on their age-discrimination claims but was unable to reach a unanimous verdict on Hearn's and Kendrick's gender-discrimination claims. The court entered a judgment in favor of GE on the age-discrimination claims and set the gender-discrimination claims for retrial. Order of Nov. 12, 1993. Hearn, Kendrick, and GE later agreed to withdraw the jury demand and to submit the case to the court without a jury based on evidence previously presented and on supplemental evidence submitted to the court in May 1994. Order of Jan. 1, 1994.

3. Jury trial transcript, filed on April 12, 1994, vol. I, at 4, 102–03, 143, 250–51; Jury trial, plaintiffs' exhs. 7, 8, 9, and 10.

4. Jury trial transcript, filed on April 12, 1994, vol. I, at 246–48, vol. II, at 145–46; Nonjury trial transcript, filed June 3, 1994, at 141.

from private personnel firms. These supplemental employees are not considered GE employees and thus do not enjoy the employment benefits received by GE employees.[5]

Hearn and Kendrick held exempt salaried positions.[6] Hearn was a first shift supervisor over the machine shop in the plant's "South End." At the time of her lay off, she had been employed with GE for approximately 23 years in various divisions of the company and had worked at the Dothan plant since 1988 in various supervisory positions.[7] Kendrick was a customer service specialist.[8] She has worked at the plant in various capacities since 1975.[9]

In August 1992, Al Veres became plant manager.[10] As the new manager, he continued efforts, initiated by his predecessor, to reorganize partially the plant's administrative structure, changing it from a traditional "supervisory" one, in which forepersons and other administrators supervised by giving orders, into a "team" structure, in which employees would confront issues and resolve problems more through interaction and cooperation among themselves.[11] Veres believed that the team concept would have several benefits. First, it would increase employee involvement in decisionmaking about the operation of the plant. Second, it would reduce the plant's "base" costs, that is, costs (such as those for salaried positions) which remain constant irrespective of changes in production. Base costs would be reduced by decreasing the number of salaried positions. Third and finally, it would improve the plant's production and competitiveness. The concept was adopted in response to instructions from higher management that base costs be trimmed, production improved, and profits increased.[12] Although the team concept had been tried previously, and unsuccessfully, Veres believed that he could make the concept work.[13]

With the reorganization and implementation of the team concept, Veres laid off Hearn[14] and reclassified Kendrick into an hourly position as a material controller, paying her $15,000 less than she had earned in her earlier position.[15] Hearn was paid through November 1992, and eventually she was able to obtain a lower-paying supervisory position with another company in the Dothan area.[16]

Several important observations should be made about how Veres implemented the team concept, about the effects of the implementation on women in management, and about Veres himself:

● Before the reorganization, there were 25 salaried positions at the Dothan plant. Twenty-one were held by men[17] and four by women.[18] To implement the team concept, Veres eliminated eight salaried positions by laying off or demoting the persons who held them. The four salaried positions held by women (including, of course, those held by Hearn and Kendrick) were

---

**5.** Jury trial transcript, filed on April 12, 1994, vol. I, at 5–6; Nonjury trial transcript, filed June 3, 1994, at 60–61; Nonjury trial transcript, filed June 3, 1994, plaintiffs' exh. 25 (Veres deposition of June 29, 1993) at 25–26.

**6.** Jury trial transcript, filed April 12, 1994, vol. III, at 239.

**7.** *Id.* at 122–24.

**8.** *Id.* at 239.

**9.** *Id.* at 236.

**10.** Jury trial transcript, filed on April 12, 1994, vol. I, at 5.

**11.** Nonjury trial transcript, filed June 3, 1994, plaintiffs' exh. 25 (Veres deposition of June 29, 1993) at 42.

**12.** *Id.* at 32.

**13.** Jury trial transcript, filed April 12, 1994, vol. I, at 84–85.

**14.** Jury trial transcript, filed April 12, 1994, vol. III, at 129.

**15.** *Id.* at 241–43.

**16.** *Id.* at 132.

**17.** They are (1) Mark Abott, (2) Tim Burrows, (3) Ed Calvin, (4) John Crater, (5) Ray Gowers, (6) Dick Greggs, (7) Dan Grucza, (8) Dave Johnson, (9) Jim Nelson, (10) Dale Papotnik, (11) Glen Poss, (12) Dave Pressman, (13) Rick Reynolds, (14) Bob Richards, (15) Dave Richards, (16) Jim Rushing, (17) Scott Sclore, (18) Jim Sellick, (19) Al Veres, (20) Steve Vinson, and (21) Bill Waters.

**18.** They are (1) Irene Hearn, (2) Betty Kendrick, (3) Kathy Kerecman, and (4) Dotsy Sanders.

all eliminated,[19] but only four of the 21 salaried positions held by men were eliminated.[20] In other words, after the reorganization, all women were removed from salaried positions; only men enjoyed these positions.[21]

● Of the eight persons whose salaried positions were eliminated, Veres laid off three and demoted five to hourly positions. Two of the three he laid off were women (one being Hearn),[22] and two of the five he demoted to hourly positions were women (one being Kendrick).[23] Thus, he laid off two of the four women and one of the 21 men, and he demoted the remaining two women and three of the remaining 20 men.

● With the reorganization, two "business team leader" positions were created. Although the team concept centered around team work, the two new positions still required "supervisory skills." Indeed, the team leader positions and the former supervisory positions overlapped substantially in the duties assumed and qualities required.[24] They differed mainly in that a supervisor generally had responsibility for a particular shift, whereas a team leader had responsibility for an entire area of the plant and was supposed to involve employees in the decision-making process more.[25] In other words, the team leader's area and range of responsibility were much greater, and he or she was to try to obtain cooperation more through consensus than with direct supervision.[26] Veres made his selections for the team leader positions without applications, and he gave both positions to men.[27] He gave the position over the plant's "North End"—where mostly assembly work is done—to one of the "North End" supervisors, Steve Vinson; Vinson had been at the plant since 1975, but lacked any technical or engineering skills.[28] Vinson received a $5,000 raise.[29] He gave the position over the "South End"—where

19. The other two were held by Kerecman and Sanders. Jury trial transcript, filed April 12, 1994, vol. I, at 10–12, vol. II, at 236; Nonjury trial transcript, filed June 3, 1994, at 56–57.

20. These four men were Bob Richards, Nelson, Rushing, and Walters. There was a fifth salaried position, held by Vinson, that was eliminated as well; however, Vinson was moved to another, newly created salaried position as a "business team leader." Nonjury trial transcript, filed June 3, 1994, at 80–81; Nonjury trial transcript, filed June 3, 1994, plaintiffs' exh. 25 (Veres deposition of June 29, 1993) at 162. Because this fifth salaried position was replaced with another salaried position held by the same person, the court has not counted the fifth salaried position.

21. Nonjury trial transcript, filed June 3, 1994, at 81–82.

22. The other woman was Kerecman. Nonjury trial transcript, filed June 3, 1994, at 56; Nonjury trial transcript, filed June 3, 1994, plaintiffs' exh. 25 (Veres deposition of June 29, 1993) at 52. Kerecman had been there for 19 years. Nonjury trial transcript, filed June 3, 1994, at 59. She came back as a temporary employee, though with a smaller salary. Id.; Nonjury trial transcript, filed June 3, 1994, plaintiffs' exh. 25 (Veres deposition of June 29, 1993) at 52. Her job was eliminated, and she could not be placed in an hourly position because she had not held an hourly position before. Nonjury trial transcript, filed June 3, 1994, at 58, 66. She was hired back as a supplemental or temporary employee and missed only one day of work due to her lay off, however. Id. at 59.

The man laid off was Walters. Id. at 9.

23. The other woman was Sanders. Jury trial transcript, filed April 12, 1994, vol. II, at 236; Nonjury trial transcript, filed June 3, 1994, at 7. Sanders's title changed from "manager/secretary" to "support administrator," but her duties remained the same as an hourly employee. Nonjury trial transcript, filed June 3, 1994, plaintiffs' exh. 25 (Veres deposition of June 29, 1993) at 107. Her pay did not go down either. Id.; Nonjury trial transcript, filed June 3, 1994, at 8.

The three men demoted were Bob Richards, Nelson, and Rushing; they were offered hourly positions. Id. at 5. Bob Richards refused the demotion and quit. Id.; Jury trial transcript, filed April 12, 1994, vol. III, at 181.

24. Nonjury trial transcript, filed June 3, 1994, at 28, 35, 51–52, 125.

25. Id. at 28, 35, 51–52, 125; Nonjury trial transcript, filed June 3, 1994, plaintiffs' exh. 25 (Veres deposition of June 29, 1993) at 42–43.

26. Nonjury trial transcript, filed June 3, 1994, at 107, 125.

27. Id. at 74–75.

28. Id. at 106, 108, 110, 200.

29. Jury trial transcript, filed April 12, 1994, vol. II, at 142; Nonjury trial transcript, filed June 3, 1994, at 115.

mainly manufacturing work was done—to Rick Reynolds, a 27–year old who had never been a supervisor (though he had had some limited supervisory experience) and who had been with GE only two years.[30] Reynolds also received a $5,000 raise.[31] Hearn, who was then a South End supervisor, had both specific training and experience in team work management, and had been with GE for approximately 23 years,[32] was not offered the South End team leader position.[33]

● Because the position was too "radical a change" for Vinson to handle and because he lacked the necessary "people skills," Veres eventually removed him [34] and created a new "hourly" job for him.[35] Veres himself replaced Vinson as the North End team leader.[36]

● Of the original 25 salaried positions, 18 were held by "exempt salaried non-supervisors." Sixteen were men,[37] and two were women (including Kendrick).[38] Of these 18, only the two women's salaried positions were eliminated. Veres laid off one woman, and he demoted the other (Kendrick), to an hourly position.[39] None of the 16 men holding salaried positions lost his position.

● At a meeting to discuss implementation of the reorganization and at other times, GE's personnel director told Veres that he "was concerned" that the proposed changes would have "a negative effect on women" and would "hurt the females in the plant that were in top jobs." [40] Thus, Veres was aware that the reorganization would have a particularly harsh impact on women supervisors.

● Veres made numerous comments indicating that he strongly disliked working with women. For example, in the spring of 1992, just before a plant staff meeting, Veres stated to a male colleague in regard to the female plant manager, "that's why I don't like working for a fucking woman and I don't want one working for me. They're always worried about the nitpicking shit and never about the stuff that counts." [41] At work, in reference to women, Veres often used the term "bitch" and "bitches." [42] In reference to women other than Hearn and Kendrick, he stated, "I'm going to get rid of those two bitches." [43] When Veres heard that Kendrick had been critical of his work, Veres accused Kendrick of having a "nervous breakdown." [44]

**30.** *Id.* at 71–72, 73, 200.

**31.** Jury trial transcript, filed April 12, 1994, vol. II, at 142.

**32.** *Id.* at 121–27; Nonjury trial transcript, filed June 3, 1994, at 24–25, 27, 31, 38, 40–42, 44, and 46.

**33.** *Id.* at 71–72.

**34.** *Id.* at 112–113; Nonjury trial transcript, filed June 3, 1994, plaintiffs' exh. 6.

**35.** Nonjury trial transcript, filed June 3, 1994, at 115–116; Nonjury trial transcript, filed June 3, 1994, plaintiffs' exh. 25 (Veres deposition of June 29, 1993) at 115.

**36.** Nonjury trial transcript, filed June 3, 1994, at 90.

**37.** They are (1) Abott, (2) Burrows, (3) Calvin, (4) Crater, (5) Gowers, (6) Greggs, (7) Grucza, (8) Johnson, (9) Papotnik, (10) Poss, (11) Pressman, (12) Rick Reynolds, (13) Dave Richards, (14) Sclore, (15) Sellick, and (16) Veres.

At trial, it was initially unclear whether there were 16 or 17 men who held exempt non-supervisory salaried positions. Whether Vinson held

such a position was unclear. Veres and GE's attorneys later clarified that, before being made a business team leader, Vinson occupied a supervisory salaried position. Nonjury trial transcript, filed June 3, 1994, at 4–5, 161–65.

**38.** The other woman was Kerecman.

**39.** The woman laid off was Kerecman. *But see supra* note 22.

**40.** Nonjury trial transcript, filed June 3, 1994, plaintiffs' exh. 21 (Crater deposition of Oct. 26, 1993) at 91–92; Nonjury trial transcript, filed June 3, 1994, at 79.

**41.** Jury trial transcript, filed on April 12, 1994, vol. II, at 193, 206.

**42.** Jury trial transcript, filed April 12, 1994, vol. III, at 137, 178, 221, 249–50; Nonjury trial transcript, filed June 3, 1994, at 85; Nonjury trial transcript, filed June 3, 1994, plaintiffs' exh. 25 (Veres deposition of June 29, 1993) at 155.

**43.** Jury trial transcript, filed April 12, 1994, vol. III, at 137.

**44.** *Id.* at 247.

● In laying off Hearn, Veres was contemptuous and appeared to disregard her 23 years with GE. He told her, "You no longer have a job here," "I don't want you to come back to the plant tomorrow," and "I want you to get your things and leave today."[45] He treated Kendrick with disdain as well. In offering her an hourly position and telling her she would lose her salaried position, Veres said, "You have two choices, you can take this job or you can go out the front door."[46]

Hearn and Kendrick filed administrative charges with the Equal Employment Opportunity Commission. 42 U.S.C.A. § 2000e–5(b) (West 1994). Hearn charged that she had been laid off because of her gender, and Kendrick charged that she had been demoted because of her gender. After receiving "right-to-sue" letters from the Commission, 42 U.S.C.A. § 2000e–5(f)(1) (West 1994), they initiated this lawsuit, 42 U.S.C.A. § 2000e–5(f)(1) & (3) (West 1994).

## II.  DISCUSSION

### A.  The Law

Hearn and Kendrick contend that, in two ways, Veres's actions toward them were motivated by their gender. First, they claim that Veres initiated or continued the team concept in order to remove them from their salaried positions because they are women. Second, they claim that, even if the team concept were adopted and continued for gender-neutral reasons, Veres selected them for lay off and demotion because of their gender. The court disagrees with their first claim and agrees with their second.

Title VII provides that, "It shall be an unlawful employment practice for an employer ... to discharge any individual[ ] or otherwise to discriminate against any individual with respect to his ... terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C.A. § 2000e–2(a) (West 1994).[47] "If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful

employment practice ..., the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ..., or any other equitable relief as the court deems appropriate." 42 U.S.C.A. § 2000e–5(g)(1) (West 1994). In 1991, Title VII was amended to expand the available remedies. The 1991 amendments provide, in relevant part, that, "In an action brought by a complaining party ... against a respondent who engaged in unlawful intentional discrimination ... the complaining party may recover compensatory and punitive damages ..., in addition to any relief authorized by [42 U.S.C.A. § 2000e–5(g) ], from the respondent." 42 U.S.C.A. § 1981a(a)(1) (West 1994).

The 1991 amendments further clarified or redefined when liability attaches under Title VII. The amendments provide that "an unlawful employment practice is established when the complaining party demonstrates that ... sex ... was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C.A. § 2000e–2(m) (West 1994). In addition, the 1991 amendments provide that, "On a claim in which an individual proves a violation ... and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court ... (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e–2(m) ...; and (ii) shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment." 42 U.S.C.A. § 2000e–5(g)(2)(B) (West 1994). Thus, under these amendments, if the employee shows merely that gender was a motivating factor, she has established liability and thus may be entitled to some relief. Whether the employer has met its "same action" burden of proof would go to the nature of the relief available.[48]

---

**45.** *Id.* at 129.

**46.** *Id.* at 241.

**47.** There are exceptions not relevant here. *E.g.,* 42 U.S.C.A. § 2000e–2(e) (West 1994).

**48.** The 1991 amendments' legislative history indicates that their purpose was to partially overrule that part of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), which exempted employers from liability and precluded any Title VII remedy if they could produce evidence and persuade the court that an

■ The parties agree that these provisions from Title VII may be reduced to the following applicable principles of law:[49] In considering a claim of discrimination, the court must go through a two-step fact-finding process. In the first step, the court must determine whether the employee has proved by a preponderance of the evidence that the employee's gender was a motivating factor for the employer's decision, even though other factors also motivated the employer. If the employee has shown this fact by a preponderance of the evidence, then liability is established and the court must go to step two of the process. At step two, the court must determine whether the employer has proved by a preponderance of the evidence that it would have taken the same adverse employment action against the employee even in the absence of the impermissible factor.

In other words, in order for an employee to be entitled to full relief, the court would have to find: first, that the employee has established that gender was a motivating factor for a decision by the employer, even though other factors also motivated the employer; and second, that the employer has failed to establish that it would have taken the same adverse employment action against the employee even in the absence of the impermissible factor. However, if at trial the only fact proved is that gender was a motivating factor, the employee has still established liability and may be entitled to limited relief, including declaratory relief, some injunctive relief, and attorney's fees and costs.[50]

adverse employment decision would still have been made in the absence of a discriminatory motive. The House Report states:

"When Congress enacted the Civil Rights Act of 1964, it precluded all invidious consideration of a person's race, color, religion, sex or national origin in employment. The effectiveness of Title VII's ban on discrimination on the basis of race, color, religion, sex or national origin has been severely undercut by the recent Supreme Court decision in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). In that case, the Supreme Court concluded that 'when a plaintiff ... proves that her gender played a motivating part in an employment decision, *the defendant may avoid a finding of liability* ... by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the plaintiff's gender into account.' Id. at 258, 109 S.Ct. at 1795 (emphasis added).

\*　　\*　　\*　　\*　　\*　　\*

"To establish liability under proposed Subsection 703(*l*), the complaining party must demonstrate that discrimination *actually contributed* or was otherwise *a factor* in an employment decision or *action.* Thus, in providing liability for discrimination that is a '*contributing factor,*' the Committee intends to restore the rule applied in many federal circuits prior to the *Price Waterhouse* decision that an employer may be held liable for any discrimination that is actually shown to play a role in a contested employment decision.

"Section 203 of the bill also amends Subsection 706(g) of Title VII to make clear that where a violation is established under Subsection 703(*l*), and where the employer establishes that it would have taken the same action in the absence of any discrimination, a court may not order the employer to hire, reinstate,

promote or provide back pay to the complainant. This provision is consistent with the current text of Title VII, which provides that 'no order of the court shall require the admission or reinstatement of an individual ... if such individual ... was refused employment ... for any reason other than discrimination.' 42 U.S.C. § 2000e–5(g).

\*　　\*　　\*　　\*　　\*　　\*

"However, the presence of a contributing discriminatory factor would still establish a Title VII violation, and a court could order other appropriate relief, including injunctive or declaratory relief, compensatory and punitive damages where appropriate, and attorney's fees."

H.R.Rep. No. 102–40(I), 102d Cong., 1st Sess. 45, 48–49, *reprinted in,* 1991 U.S.C.C.A.N. 549, 583, 586–87 (emphasis in original) (footnotes omitted).

**49.** These principles of law are taken almost verbatim from the court's instructions to the jury, filed on Nov. 4, 1993, at 9, to which none of the parties objected.

**50.** At the jury trial, the verdict forms for each plaintiff were divided into two questions: (1) whether the plaintiff has proved by a preponderance of the evidence that her gender was a motivating factor for the decision by the employer, even though other factors also motivated the employer; and (2) whether the employer has proved by a preponderance of the evidence that it would have taken the same adverse employment action against the plaintiff even in the absence of the impermissible factor. The relief available depended on whether the jury answered yes to only question one or yes to both questions.

However, even if the burden did not shift to GE under §§ 2000e–2(m) and 2000e–5(g)(2)(B) and thus Hearn and Kendrick bore not just the

An employee may prove a violation of Title VII with either circumstantial or direct evidence. Hearn and Kendrick maintain that they have provided both types of evidence.

## B. Circumstantial Evidence

[2, 3] In *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court "established an allocation of the burden of production and an order for the presentation of proof in Title VII discriminatory-treatment cases." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 2746, 125 L.Ed.2d 407 (1993). Under the *McDonnell Douglas* approach, an employee has the initial burden of establishing a prima facie case of unlawful gender discrimination by a preponderance of evidence. 411 U.S. at 802, 93 S.Ct. at 1824. A "prima facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396 (1977). An employee may establish a prima facie case of discrimination in lay off or demotion by showing (1) membership in a protected group, (2) qualification for the position held, (3) lay off or demotion, and (4) retention in the position of a less or equally qualified person outside the protected group. *See Blistein v. St. John's College,* 74 F.3d 1459, 1470 (4th Cir.1996) (reduction in force case); *Seman v. Coplay Cement Co.,* 26 F.3d 428, 432 (3rd Cir.1994) (same); *LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 842 (1st Cir.1993), *cert. denied,* ___ U.S. ___, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994) (same); *Krause v. Dresser Industries, Inc.,* 910 F.2d 674, 677 (10th Cir.1990) (same).

■ If the employee establishes a prima facie case, the burden then shifts to the employer to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the employer discriminated against the employee. This may be done by the employer articulating a legitimate, non-discriminatory reason for the employment decision, which is clear, reasonably specific and worthy of credence. The employer has a burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253–55, 258, 101 S.Ct. 1089, 1093–94, 1096, 67 L.Ed.2d 207 (1981). "If the trier of fact finds that the elements of the prima facie case are supported by a preponderance of the evidence and the employer remains silent, the court must enter judgment for the plaintiff." *O'Connor v. Consolidated Coin Caterers Corp.,* ___ U.S. ___, ___, ___, 116 S.Ct. 1307, 1309, 134 L.Ed.2d 433 (1996).

■ Once the employer satisfies this burden of production, the employee then has the burden of persuading the court that the proffered reason for the employment decision is a pretext for discrimination. The employee may satisfy this burden either directly by persuading the court that a discriminatory reason more than likely motivated the employer or indirectly by persuading the court that the proffered reason for the employment decision is not worthy of belief. By so persuading the court, the employee satisfies her ultimate burden of demonstrating by a preponderance of the evidence that she has been the victim of unlawful discrimination. *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

■ However, where, as in this case, the court has conducted a full hearing and has sufficient evidence to determine whether an employee has been a victim of discrimination, the court need not go through the *McDonnell Douglas* burden-shifting process and should instead reach the ultimate issue of discrimination. "If ... the defendant has succeeded in carrying its burden of production, the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant. ... The presumption, having fulfilled its role of forcing the defendant

burden of showing that gender was a motivating factor but the full burden of showing that they had been laid off and demoted because of their gender (including that GE would not have reached the same decision in the absence of the impermissible factor), the court would make the same findings of fact and reach the same the conclusions, that is, that Veres did not initiate or continue the team concept in order to remove them from their salaried positions because they are women but that he did select them for lay off and demotion because of their gender.

to come forward with some response, simply drops out of the picture." *St. Mary's Honor Center,* 509 U.S. at 510–11, 113 S.Ct. at 2749. *See also United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983); *Powers v. Alabama Department of Education,* 854 F.2d 1285, 1290 (11th Cir. 1988), *cert. denied,* 490 U.S. 1107, 109 S.Ct. 3158, 104 L.Ed.2d 1021 (1989).

Moreover, the Supreme Court announced the *McDonnell Douglas* approach before the 1991 amendments to Title VII. Under *McDonnell Douglas,* the burden of persuasion never shifts from the employee or plaintiff. However, under the 1991 amendments, to establish liability, the employee need only show "that ... sex ... was a motivating factor for any employment practice, even though other factors also motivated the practice," 42 U.S.C.A. § 2000e–2(m) (West 1994), and then, to avoid the full array of remedies, the employer must "demonstrate[ ] that [it] would have taken the same action in the absence of the impermissible motivating factor." 42 U.S.C.A. § 2000e–5(g)(2)(B) (West 1994).

Nonetheless, the *McDonnell Douglas* analysis may still be helpful in fully tried cases to which the 1991 amendments apply and in which the employee relies on circumstantial evidence. Such cases pose "difficult" and "sensitive" issues of subjective intent and objective action. *Aikens,* 460 U.S. at 716, 103 S.Ct. 1478. The *McDonnell Douglas* analysis provides an invaluable method of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *Burdine,* 450 U.S. at 255, n. 8, 101 S.Ct. at 1094, n. 8. Positing such elementary *McDonnell Douglas* questions as whether the elements for a prima facie case are present (in particular, whether the plaintiff was treated differently from a similarly situated person of a group different from that to which the plaintiff belongs), the clarity and nature of the employer's justification, and whether the justification is pretextual and, if so, whether it is a pretext for discrimination, would help to assure that, in resolving the Title VII claim—and, in particular, in

resolving the ultimate issues of whether gender was a motivating factor for the decision by the employer, even though other factors also motivated the employer, and whether the employer would have taken the same adverse employment action against the employee even in the absence of the impermissible factor, 42 U.S.C.A. §§ 2000e–2(m), 2000e–5(g)(2)(B) (West 1994)—the court arrives at its ultimate conclusions less through intuition and more through factual reasoning and analysis. *See, e.g., Noble v. Alabama Dept. of Environmental Management,* 872 F.2d 361, 365 n. 4 (11th Cir.1989); *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1184 (11th Cir.1984). However, because the *McDonnell Douglas* analysis is only a "procedural device," *St. Mary's Honor Center,* 509 U.S. at 521, 113 S.Ct. at 2755, it should not be applied too rigidly; nor should it be viewed as an end in itself. For example, the mere disbelief of the employer's proffered reason does not "compel" a finding of discrimination. *Id.* at 510–12, 113 S.Ct. at 2749. In other words, the *McDonnell Douglas* approach should not be used by the court as a "substitute" for reaching the ultimate issue of whether the employee has, in fact, been a victim of discrimination. *Moore v. Alabama State University,* 864 F.2d 103, 105 (11th Cir.1989).

Applying the above principles, the court is not convinced that the fact that Hearn and Kendrick or any other employees were women was even a motivating factor in the adoption of the team concept. To be sure, the fact that all women lost their salaried positions and almost all the men kept theirs raises a strong suspicion that a motivating reason behind the adoption of the team concept was the intent to discriminate. In addition, Hearn and Kendrick have presented credible evidence that Veres disliked working with women. As described above, Veres once stated to a male colleague in regard to the female plant manager, "that's why I don't like working for a fucking woman and I don't want one working for me. They're always worried about the nitpicking shit and never about the stuff that counts." [51] Veres often used the term "bitch" and "bitches," [52]

**51.** Jury trial transcript, filed on April 12, 1994, vol. II, at 193, 206.

**52.** Jury trial transcript, filed April 12, 1994, vol. III, at 137, 178, 221, 249–50; Nonjury trial transcript, filed June 3, 1994, at 85; Nonjury trial

and once stated, referring to two female employees, "I'm going to get rid of those two bitches."[53] Finally, he accused Kendrick of having a "nervous breakdown" when she criticized his work.[54]

Nevertheless, the court credits evidence that the team concept was adopted in response to instructions from higher management that base costs be trimmed, production improved, and profits increased, and, most critically, the evidence reflects that the concept was first introduced, not by Veres, but by his female predecessor. The court further credits the evidence that Veres honestly and for non-discriminatory reasons believed that the concept would have several benefits: that it would increase employee involvement; that it would reduce the plant's base costs; and that it would improve the plant's production and competitiveness.

■ However, other evidence, in conjunction with the evidence of Veres's bias, convinces the court that, in implementing the team concept, Veres laid off Hearn and demoted Kendrick because they are women; in other words, their gender was a motivating factor, and, in absence of that factor, he would not have laid off Hearn and demoted Kendrick. With regard to Hearn, this *other evidence* is that she was more qualified for the South End business team leader position than was Reynolds, the man who received it. Reynolds was only 27 years old, had never been a supervisor (though he had had some limited supervisory experience), and had been with GE for only two years.[55] Hearn was then a South End supervisor, had both

specific training and experience in team work management, and had been with GE for approximately 23 years.[56] GE has suggested that Veres chose Reynolds over Hearn because Hearn was "dictatorial."[57] The evidence that the court credits reflects that Hearn was not dictatorial.[58] In addition, the credible evidence is that, not only had Hearn been a supervisor since 1988, and was at the time of selection one at the South End, she was very good one. She had the experience and the needed "people skills" and "technical skills."[59] GE has also suggested that a team leader had to have some engineering experience or an engineering degree, which Hearn did not have.[60] The court does not credit this reason. Neither Vinson, who was selected for the North End leadership position, nor Veres, who replaced Vinson, had an engineering degree.[61] Nor, according to the credible evidence, were engineering skills necessary or preferred for the position.[62] The most important skills were "people skills," "leadership skills," and general "technical skills," all of which Hearn had.[63] Thus, Hearn's gender was a motivating factor in Veres's decision not to appoint her to the South End business team leader position, and, in the absence of this factor, Veres would have appointed Hearn rather than Reynolds to the position.

■ With regard to Kendrick, this *other evidence* is that, of the original 25 salaried positions, 18 were held by "exempt salaried non-supervisors"; that 16 of them were men,[64] and two were women (including Ken-

transcript, filed June 3, 1994, plaintiffs' exh. 25 (Veres deposition of June 29, 1993) at 155.

53. Jury trial transcript, filed April 12, 1994, vol. III, at 137.

54. *Id.* at 247.

55. Nonjury trial transcript, filed June 3, 1994, at 71–72, 73, 200.

56. *Id.* at 24–25, 27, 31, 38, 40–42, 44, and 46; Jury trial transcript, filed April 12, 1994, vol. III, at 121–27.

57. Nonjury trial transcript, filed June 3, 1994, at 19. Nonjury trial transcript, filed June 3, 1994, plaintiffs' exh. 25 (Veres deposition of June 29, 1993) at 126.

58. Jury trial transcript, filed April 12, 1994, vol. III, at 159–63; Nonjury trial transcript, filed June 3, 1994, at 25, 26, 42.

59. Nonjury trial transcript, filed June 3, 1994, at 24–25, 27, 31, 38, 40–42, 44, and 46.

60. *Id.* at 13.

61. *Id.* at 14, 108.

62. *Id.* at 26.

63. *Id.* at 27, 109.

64. They are (1) Abott, (2) Burrows, (3) Calvin, (4) Crater (5) Gowers, (6) Greggs, (7) Grucza, (8) Johnson, (9) Papotnik, (10) Poss, (11) Pressman, (12) Rick Reynolds, (13) Dave Richards, (14) Sclore, (15) Sellick, (16) Veres, and (17) Vinson.

drick);[65] that, of these 18, only the two women's salaried positions were eliminated; that Veres laid off one women and he demoted the other (Kendrick), to an hourly position; and that not even one of the 16 men holding salaried positions lost his position. Veres maintained that these 16 men held "essential jobs" which could not be eliminated. However, the evidence reflects that the determinative issue was not always the essentiality of the job but rather who should lose salaried status for hourly status. Kendrick's job duties continued to be performed by another employee, albeit an hourly one.[66] Thus, the court finds no reason why none of these 16 men could not have continued to do their so-called essential jobs, but at an hourly pay. Admittedly, Kendrick was moved to another hourly job and her job assigned to an hourly employee, but the net effect was that her job was simply downgraded to an hourly one. The positions held by the men could have been similarly downgraded. Veres maintained that many of these men were engineers and that GE was "pretty thin in the engineering department,"[67] but when one of the engineers left shortly after the reorganization, he was not replaced.[68] In any event, the court believes that but for his bias against women Veres would have downgraded the jobs held by such non-engineers as Burrows, Papotnik, Greggs, or Crater rather than that held by such a longstanding and excellent employee as was Kendrick.

In conclusion, this evidence, in conjunction with Veres's bias against working with women, convinces the court that, in implementing the team concept, Veres laid off Hearn and demoted Kendrick because they are women; in other words, Hearn and Kendrick have shown by a preponderance of the evidence that their gender was a motivating factor, and GE has not shown by a preponderance of the evidence that, in absence of that factor, Veres would still have laid off Hearn and demoted Kendrick.[69]

### C. Direct Evidence

As stated, Hearn and Kendrick maintain that they have not only circumstantial but direct evidence of discrimination. According to the Eleventh Circuit Court of Appeals, "evidence is direct when it is sufficient to prove discrimination without inference or presumption." *Clark v. Coats and Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir.1993). "Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence." *Id.* Confronted with such evidence, a trial court must assess the employee's claim as follows: "[T]he trial judge must initially make a credibility finding as to whether or not plaintiff's proffered direct evidence of discrimination is to be believed. . . . The trial court must also make a finding of fact as to whether or not the decisionmaker 'relied upon sex-based considerations in coming to its decision.' . . . In other words, the fact finder must determine whether 'gender played a motivating part in an employment decision.' . . . If the trial court both credits the direct evidence and finds that the evidence played a substantial role in the employment decision at issue, then the defendant can avoid liability only by proving that it would have made the same decision even if it had not allowed such discrimination to play a role." *Haynes v. W.C. Caye & Company, Inc.*, 52 F.3d 928, 930 (11th Cir.1995) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 242, 244, 109 S.Ct. 1775, 1786, 1804, 104 L.Ed.2d 268 (1989)).

The above principles are much more easily stated than applied; indeed, the court has some serious concerns about the continued applicability of the principles at all. First, it is unclear what the Eleventh Circuit meant by its definition that direct evidence is "evidence sufficient to prove discrimination with-

65. The other woman was Kerecman.

66. Sarah Phillips assumed Kendrick's duties, or at least 90% of them. Jury trial transcript, filed April 12, 1994, vol. III, at 4–5.

67. Nonjury trial transcript, filed June 3, 1994, at 158.

68. This engineer was Sclore. *Id.* at 159–60.

69. All of the exempt *supervisory* salaried positions, both male and female, were eliminated. Nonjury trial transcript, filed June 3, 1994, at 4–5, 94. They were held by Bob Richards, Nelson, Rushing, Walters, Vinson, and Hearn. *Id.* at 4–5, 144. The court does not take issue with this broad sweep, *id.* at 145–46, other than that Veres selected Reynolds over Hearn to be a business team leader because Hearn was a woman.

out inference or presumption." *Clark*, 990 F.2d at 1223. Does the definition mean that the evidence is sufficient if it reflects, without inference or presumption, a mere discriminatory bias toward the group to which the employee belongs, in other words, that the evidence need only reflect a general discriminatory bias? Or does the direct evidence definition require more, that is, that the evidence must reflect, without inference or presumption, a specific discriminatory intent to commit the challenged conduct? In *Haynes v. W.C. Caye & Company, Inc.*, the Eleventh Circuit implied the former, giving as an example of direct evidence of a gender-based demotion or discharge, a supervisory's question whether "a sweet little old lady could get tough enough with the customers and collect the money." 52 F.3d at 930. However, in *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550 (11th Cir.1988), the court appeared to apply the latter definition, giving as an example of direct evidence of age discrimination, a scrap of paper reading, "Fire Rollins—she is too old." 837 F.2d at 1558 n. 13.

Moreover, this court is not sure that an endeavor to resolve what the Eleventh Circuit meant by its definition would be fruitful. Determining whether a specific piece of evidence constitutes "direct evidence" would necessarily be an imprecise effort. This is so because, in the end, "direct evidence" is really in the eye of the beholder. A recent commentator described the efforts by the Courts of Appeals to define direct evidence as "a semantic haze." Robert Brookins, Mixed–Motives, Title VII, and Removing Sexism from Employment: The Reality and the Rhetoric, 59 Alb.L.Rev. 1, 86 (1995).

This court also questions the reasons behind drawing any distinction between direct and circumstantial evidence in the context of discrimination law. In most, if not all, other areas of the law, the two are treated as comparable. In *Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954), the Supreme Court wrote, with regard to criminal law, that, "Circumstantial evidence ... is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities." Similarly, in *United States v. Wolfe*, 611 F.2d 1152, 1155 (1980), the former Fifth Circuit wrote that, "As a general rule the law makes no distinction between direct and circumstantial evidence, but simply requires before convicting a defendant you, the jury, be satisfied of the defendant's guilt beyond a reasonable doubt from the evidence in the case." And in *United States v. Rackley*, 742 F.2d 1266, 1273–1274 (1984), the Eleventh Circuit wrote that, "The law recognizes both direct and circumstantial evidence, and ... it makes no distinction as to the weight to be given either."

This refusal to distinguish the types of evidence generally applies in the civil context as well. The pattern instruction for civil jury cases, as given in E.J. Devitt, et al., Federal Jury Practice and Instructions: Civil, § 72.03 (1987), is as follows: "As a general rule, the law makes no distinction between direct or circumstantial evidence, but simply requires that the jury find the facts in accordance with the preponderance of all the evidence in the case, both direct and circumstantial."

In view of the refusal of courts, as a general proposition, to draw a distinction between direct and circumstantial evidence, this court sees no reason to single out discrimination law for different treatment. The Supreme Court's admonition in *Holland*—"circumstantial evidence may in some cases point to a wholly incorrect result," but "this is equally true of testimonial evidence," 348 U.S. at 139–40, 75 S.Ct. at 137–138—applies equally to discrimination law. Indeed, if a distinction needed to be drawn anywhere, it would be in the criminal context, since the burden of proof there is the highest.

But perhaps most significantly, the burden-shifting approach required by the Eleventh Circuit when a court is confronted with direct evidence—under which an employer could actually "avoid liability by proving that it would have made the same decision even if it had not allowed such discrimination to play

a role," *Haynes,* 52 F.3d at 930—could conflict with the approach required by the 1991 amendments to Title VII. Under these amendments, to establish liability and be a prevailing party, the employee need only show "that … sex … was a motivating factor for any employment practice, even though other factors also motivated the practice," 42 U.S.C.A. § 2000e–2(m) (West 1994). Whether the employer can then demonstrate that it "would have taken the same action in the absence of the impermissible motivating factor" goes to the issue of relief. In other words, even if the employer meets its burden, the employee may still be entitled to relief, albeit limited: the court may grant declaratory relief, injunctive relief (but not including, among other things, admission, reinstatement, hiring, and promotion), and attorney's fees and costs. 42 U.S.C.A. § 2000e–5(g)(2)(B) (West 1994). Under the direct evidence approach of the Eleventh Circuit, on the other hand, showing that discrimination was a motivating factor is not sufficient to prove liability.

In any event, troubling though the Eleventh Circuit's direct-evidence approach may be, it is not determinative here. The court has found that, based on circumstantial evidence, Hearn and Kendrick have been victims of discrimination.

■ To make sure that the record is complete, however, the court will also apply the direct evidence principles of law. Hearn and Kendrick maintain that the following constitutes direct evidence: Veres's statement that "I don't like working for a fucking woman and I don't want one working for me. They're always worried about the nitpicking shit and never about the stuff that counts." [70] There is no question that this comment evidences a bias by Veres against working with women. In addition, because Veres's statement is, at least, comparable to the biased comment in *Haynes v. W.C. Caye & Company, Inc.,* it constitutes direct evidence. The court further finds this evidence "is to be believed." *Haynes,* 52 F.3d at 930. However, the court is not convinced that Veres "'relied upon [this] sex-based consideration[ ] in coming to [his] decision'" to continue with implementation of the team concept. *Id.*

Moreover, the court is convinced that Veres "would have made the same decision even if [he] had not allowed such discrimination to play a role." *Id.* As stated, the team concept was adopted in response to instructions from higher management that base costs be trimmed, production improved, and profits increased, and, most critically, the evidence reflects that the concept was introduced, not by Veres, but by his female predecessor.

However, for the reasons already given at length above, Hearn and Kendrick have convinced the court that Veres "'relied upon [this] sex-based consideration[ ] in coming to [his] decision'" to lay off Hearn and demote Kendrick, *id.,* and GE has not convinced the court that Veres "would have made the same decision even if [he] had not allowed such discrimination to play a role." *Id.*

### D. Relief

■ The court is thus convinced that GE, acting through Veres, laid off Hearn and demoted Kendrick because of their gender. As victims of gender discrimination, Hearn and Kendrick are entitled to appropriate relief. 42 U.S.C.A. §§ 1981a, 2000e–5(g)(1) (West 1994). First, they are presumptively entitled to backpay and other back benefits they would have received had they not been discharged and demoted. *Lengen v. Dept. of Transp.,* 903 F.2d 1464, 1468 (11th Cir.1990). Because GE has not overcome this presumption, the court will award Hearn and Kendrick backpay and other benefits. The court will give the parties an opportunity to agree upon the appropriate amount. If the parties cannot reach an agreement on this issue, the court will itself determine, after an additional hearing, how much they should receive in backpay and other back benefits.

■ Second, as victims of gender discrimination, Hearn and Kendrick are presumptively entitled to immediate instatement or reinstatement to the positions at GE they would have had in the absence of discrimination. *Nord v. United States Steel Corp.,* 758 F.2d 1462, 1470 (11th Cir.1985). However, the court cannot determine from the current record whether such positions still exist, whether others would have to be bumped in order to place Hearn and Kendrick in the

---

70. Jury trial transcript, filed on April 12, 1994, vol. II, at 193, 206.

positions, or whether there are comparable positions available. *See Hicks v. Dothan City Board of Educ.*, 814 F.Supp. 1044 (M.D.Ala.1993) (Thompson, J.) (discussing how a court should approach instatement or reinstatement, in particular when the position sought may already be filled). The court will therefore give the parties an opportunity to resolve this issue by agreement. If the parties cannot reach an agreement, the court will itself determine, after an additional hearing, the instatement or reinstatement issue.

▇▇▇ Third, Title VII provides that the "complaining party may recover compensatory and punitive damages." 42 U.S.C.A. § 1981a(a)(1) (West 1994). Hearn and Kendrick seek compensatory damages for mental anguish. Hearn, Kendrick and GE agree that the standard for the award of such damages is as follows: The law has no fixed monetary standard to compensate for emotional distress. This element of damages is left to the court's good sound judgment and discretion as to what amount would reasonably and fairly compensate the employee for such emotional distress as the court finds from the evidence she did suffer. If the court is satisfied by a preponderance of the evidence that the employee has undergone emotional distress as a proximate result of the wrongs in question, the court should award a sum which will reasonably and fairly compensate her for such emotional distress already suffered.[71]

Veres's actions have placed an "emotional strain" on Hearn; she has lived in "fear" and "torment."[72] She has had "sleepless nights."[73] With the loss of her job, she "live[d] in fear every day of losing everything that [she had] worked for."[74] Her "whole lifestyle [was] affected."[75] For mental anguish, Hearn should receive $50,000. Similarly, as a result of Veres's actions, Kendrick has had "a very rough experience"; her work is "not very pleasant," she "can't sleep at night," and she has "lost weight."[76] For mental anguish, Kendrick should receive $20,000.

▇▇▇ Title VII provides that "A complaining party may recover punitive damages … if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C.A. § 1981a(b)(1) (West 1994). Hearn, Kendrick and GE agree that in determining whether to award punitive damages and, if so, how much, the court should consider the following legal principles: Malice means the intentional doing of a wrongful act without just cause or excuse, with an intent to injure the person or property of another person. The purpose of awarding punitive damages is to allow money recovery to the injured party by way of punishment to the wrongdoer, and for the added purpose of protecting the public by deterring the wrongdoer and others from doing such wrong in the future. *BMW of North America, Inc. v. Gore*, —— U.S. ——, ——, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996) ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition"). The imposition of punitive damages is entirely discretionary with the court. Should the court award punitive damages, in fixing the amount, it must take into consideration the character and degree of the wrong as shown by the evidence in the case, and the necessity of preventing similar wrongs. *BMW of North America, Inc.*, —— U.S. at ——, 116 S.Ct. at 1599 ("exemplary damages imposed on a defendant should reflect 'the enormity of his offense'") (quoting *Day v. Woodworth*, 54 U.S. 363, 371, 13 How. 363, 371, 14 L.Ed. 181 (1851)). The court's decision should not be based on sympathy, prejudice, passion or bias.[77] The court is convinced that, in laying

---

**71.** These principles of law are taken almost verbatim from the court's instructions to the jury, filed on Nov. 4, 1993, at 9, to which none of the parties objected.

**72.** Jury trial transcript, filed April 12, 1994, vol. III, at 140.

**73.** *Id.* at 144.

**74.** *Id.* at 132.

**75.** *Id.* at 144.

**76.** *Id.* at 258–61.

**77.** These principles of law are taken almost verbatim from the court's instructions to the jury, filed on Nov. 4, 1993, at 9–10, to which none of the parties objected.

off Hearn and demoting Kendrick because of their gender, Veres acted "with reckless indifference to the federally protected rights" of Hearn and Kendrick. 42 U.S.C.A. § 1981a(b)(1) (West 1994). Moreover, in view of the additional evidence of the contemptuous manner in which Veres told Hearn she was laid off and Kendrick she was being demoted, the court finds that Veres also acted with malice. Hearn should receive $75,000, and Kendrick should receive $75,000, in punitive damages.

Fourth, because of Veres's deep-seated bias against women in the workplace, because of the evasive manner in which he effected this bias, and because there is no evidence that GE intends to remove Veres from his supervisory capacity, the court will provide both and declaratory and injunctive relief to help assure that, in the future, Hearn and Kendrick will be able to work in a bias-free environment at the GE plant in Dothan.

Finally, Hearn and Kendrick are entitled to recover reasonable attorney's fees and expenses. 42 U.S.C.A. § 2000e–5(k) (West 1994). The court will give the parties an opportunity to agree to the amount of such fees and expenses.

An appropriate judgment will be entered in accordance with this memorandum opinion.

### JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That judgment is entered in favor of plaintiffs Renate "Irene" Hearn and Betty Kendrick and against defendant General Electric Company;

(2) That it is DECLARED that defendant General Electric Company laid off plaintiff Hearn and demoted plaintiff Kendrick because they are women, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17 (West 1994);

(3) That defendant General Electric Company at its plant in Dothan, Alabama, and its officers, agents, servants, employees, and those persons in active concert or participation with them who receive actual notice of this order, are each ENJOINED and RESTRAINED from discriminating against plaintiffs Hearn and Kendrick in layoffs and demotions;

(4) That plaintiff Hearn is to have and recover the sum of $50,000 in compensatory damages from defendant General Electric Company;

(5) That plaintiff Kendrick is to have and recover the sum of $20,000 in compensatory damages from defendant General Electric Company;

(6) That plaintiff Hearn is to have and recover the sum of $75,000 in punitive damages from defendant General Electric Company;

(7) That plaintiff Kendrick is to have and recover the sum of $75,000 in punitive damages from defendant General Electric Company;

(8) That plaintiffs Hearn and Kendrick are entitled to instatement or reinstatement to appropriate positions;

(9) That, if the parties cannot agree on the issue of instatement or reinstatement, plaintiffs Hearn and Kendrick are allowed 28 days from the date of this order to file a request for the court to determine this issue;

(10) That plaintiffs Hearn and Kendrick are to have and recover from defendant General Electric Company such backpay and employment benefits they would have received had they not been illegally discriminated against because of their gender;

(11) That, if the parties cannot agree on appropriate backpay and other back employment benefits, plaintiffs Hearn and Kendrick are allowed 28 days from the date of this order to file a request for the court to determine these benefits;

(12) That plaintiffs Hearn and Kendrick are to have and recover from defendant General Electric Company reasonable attorney's fees and expenses; and

(13) That, if the parties cannot agree on reasonable attorney's fees and expenses, plaintiffs Hearn and Kendrick are allowed 28 days from the date of this order to file a request for the court to determine such fees and expenses.

It is further ORDERED that costs are taxed against defendant General Electric Company, for which execution may issue.

The clerk of the court is DIRECTED to issue a writ of injunction.