**Sheila UNDERWOOD, Plaintiff,**

v.

**NORTHPORT HEALTH SERVICES, INC., and Tallassee Healthcare Facility, Defendants.**

**No. Civ.A. 98T1094–N.**

United States District Court, M.D. Alabama, Northern Division.

Aug. 2, 1999.

---

Donna E. Brooks, Gorham & Waldrep, P.C., Birmingham, AL, T. Dudley Perry, Sr., Ala. Dept. of Transp., Legal Div., Montgomery, AL, for plaintiff.

Patricia Powell Burke, D. Frank Davis, Burr & Forman, Birmingham, AL, for defendant.

## ORDER

MYRON H. THOMPSON, District Judge.

Plaintiff Sheila Underwood, who is white, brings this lawsuit pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 1981a, 2000e through 2000e–17, alleging that she was demoted, subjected to a hostile work environment, and constructively discharged because of her race. She names as defendants Northport Health Services, Inc., and

Tallassee Healthcare Facility. The court has jurisdiction pursuant to 42 U.S.C.A. § 2000e–5(f)(3) (Title VII), and 28 U.S.C.A. §§ 1331 (federal question) and 1343 (civil rights).

This lawsuit is now before the court on the defendants' motion for summary judgment. For reasons to follow, the court will grant the motion only as to Underwood's constructive-discharge claim.

## I. SUMMARY–JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–17 (11th Cir.1993) (discussing how the responsibilities on the movant and the non-movant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or non-movant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

## II. FACTUAL BACKGROUND

The facts, as garnered from the affidavits, deposition testimony, and other evidence submitted by the parties but viewed in the light most favorable to the plaintiff, are as follows. Plaintiff Sheila Underwood, a nurse, worked for defendant Northport Healthcare Services, Inc., in a variety of positions from 1989 until she resigned in January 1998. Northport owns approximately 29 nursing homes in the southeastern United States, including defendant Tallassee Healthcare Facility.[1]

In 1989, Underwood began working for Northport as a Certified Nursing Assistant.[2] Subsequently, she left and earned a degree in nursing and, in 1992, returned to Northport as a Registered Nurse ("RN").[3] In 1993, she was promoted to Assistant Director of Nursing in Northport's Birmingham, Alabama facility.[4] In 1994, she transferred twice within the company, first, to a position called MDS Care Plan Coordinator in the Opp, Alabama facility, and, second, to the position of Assistant Director of Nursing at the company's Wetumpka, Alabama facility.[5]

Northport purchased the Tallassee Healthcare Facility in Tallassee, Alabama, in November 1996.[6] In February 1997, Underwood accepted a position as RN Unit Manager at the Tallassee facility.[7] Although it was a step down from her position as Assistant Director of Nursing, Underwood took the position because she lived in Tallassee and had grown tired of driving back and forth from her home to Wetumpka.

When Underwood arrived at the Tallassee facility, the Director of Nursing was

1. Evidentiary materials in support of motion for summary judgment, filed April 7, 1999, exhibit 2 (deposition of Deborah Elmore (hereafter "Elmore deposition")) at 92.

2. Attachments to plaintiff's response to defendants' motion for summary judgment, filed April 29, 1999, deposition of Sheila Underwood (hereafter "Underwood deposition") at 12.

3. *Id.* at 15–16.

4. *Id.* at 18–19.

5. *Id.* at 27–28.

6. *Id.* at 33.

7. *Id.* at 30–31.

Sandra Boykin, an African–American who had worked there prior to the change in ownership.[8] Jason Banks, who is white, was hired to serve as Administrator of the facility. Underwood was promoted to Assistant Director shortly after arriving.[9] Soon after Underwood became Assistant Director, Boykin went on maternity leave and Underwood assumed Boykin's Director of Nursing responsibilities.[10]

When Boykin returned from maternity leave on March 21, 1997, Northport demoted her to Assistant Director of Nursing and formally promoted Underwood to Director of Nursing. A number of employees were angered by the demotion.[11] These employees included Zora Robertson, Gieslar Ingram, Betty Ponds, and Lily Macintyre, all of whom are African–American nursing assistants who work on the front hall of the facility.[12] Debbie Elmore, Northport's Director of Human Resources, learned that a group of employees was preparing a petition seeking Boykin's reinstatement to Director of Nursing.[13]

After Boykin's demotion, Underwood began to experience what she perceived as rude behavior from the African–American nursing assistants who worked the day shift on the front hall.[14] This group included Robertson, Ingram, Ponds, and Macintyre, as well as Denise Peterson and Johnnie Mae Skipper. Specifically, Underwood contends that, when she greeted the front-hall nurses, she received little, if any, reply, and, as soon as she turned her back, she heard the nurses begin to talk and laugh.[15] She further states that disci-

pline "became very difficult" because "[t]here would be stares and grumbling behind [her] back, [she developed] concerns about how to approach staff about counseling, ... [a]nd [she] felt as if [the front-hall nurses] were watching [her] every move."[16] After she spoke to the nurses, she heard them make comments, which she took to be about her, such as: "Well, what does she think she's doing?" and "What does she care?"[17] According to Underwood, there was an "undercurrent" at the facility "[s]o [she] had to be very careful as to approaching staff ... [because] they might accuse [her] of being racist...."[18] However, the record reveals only one occasion on which an employee directly accused Underwood of racism. On that occasion, Underwood received a complaint from a patient that an African–American nursing assistant had slapped her, and, when Underwood investigated the complaint, nursing assistant Ingram told Underwood that she would not have investigated the complaint had a white nursing assistant been accused of wrongdoing.

Later, Boykin resigned at the request of Administrator Banks.[19] After Boykin left the facility, Underwood felt that the attitudes of the front-hall nurses worsened.[20] Underwood recalls: "I felt like I was being watched every minute, especially from those down the hall; that regardless of what I said, it would be interpreted as something bad. I had to be very careful ... about counseling or approaching cer-

8. *Id.* at 58.

9. *Id.* at 65–66.

10. *Id.* at 66–67.

11. Attachments to plaintiff's response to defendants' motion for summary judgment, filed April 29, 1999, deposition of Jason Duran Banks (hereafter "Banks deposition") at 14–15.

12. *Id.* at 15, 16.

13. Elmore deposition at 65.

14. Underwood deposition at 90.

15. *Id.* at 90–91.

16. *Id.* at 89.

17. *Id.* at 91.

18. *Id.* at 89.

19. Banks deposition at 28–29.

20. Underwood deposition at 93–94.

tain staff members." [21] According to Underwood, the front-hall nurses also began to look at her with "drop-dead eyes," [22] stared at her, and "scrutiniz[ed]" her actions. [23] When Underwood walked by, they would not speak to her and then would begin talking and laughing. [24] Although there is no evidence of the use of any racial slurs, [25] Banks informed Elmore of the "racial tension" in the office, and explained to her that he felt the staff held him, and especially Underwood, responsible for Boykin's departure. [26]

Underwood's superiors received a number of complaints about her from employees at Tallassee while Underwood was Director of Nursing. [27] Human Resources Director Elmore contends that some employees complained about Underwood being hot-headed, temperamental and flighty, [28] while others complained about Underwood's reduction of their hours. [29]

On November 11, 1997, at the request of Tallassee employees, Elmore went to the facility for a meeting with employees to discuss further complaints about Underwood. [30] Some of the employees complained that Underwood was racist. [31] Following the meeting, Elmore met with Banks and Gail Bimbo, who served as Northport's Regional Manager with responsibility for the Tallassee facility, [32] to discuss what action should be taken, and they decided that Underwood could not remain as Director of Nursing. [33] Banks and Bimbo suggested that they give Underwood the choice of demotion to RN Unit Manager or termination, and Elmore agreed. [34] That night, Banks presented Underwood with the choice between being demoted or resigning. Underwood chose to accept the position of RN Unit Manager, a two-step demotion that carried a cut in pay.

Thereafter, the defendants reassigned Johnnie Mae Hatten, an African–American, from Assistant Director of Nursing to Director of Nursing. [35] Hatten had been the Assistant Director for a few months at that time, and had recently completed her degree in registered nursing. She also had several years of experience as a licensed practical nurse, and some supervisory nursing experience. Lee Ann Boles, who is white, was promoted from RN Unit Manager to Assistant Director of Nursing. [36] Underwood became RN Unit Manager on the back hall of the facility. She was instructed by Bimbo and Elmore not to discipline any employees, but instead to report all disciplinary problems to Hatten. [37] The Assistant Director and the Director were normally responsible for verbal and written warnings for serious problems, while the RN Unit Manager position involved only informal counsel-

21. *Id.*

22. *Id.* at 98.

23. *Id.* at 98–99.

24. *Id.* at 91, 98.

25. *Id.* at 100–105.

26. *Id.* at 94. It is unclear whether Underwood heard this conversation firsthand.

27. Elmore deposition at 35–39, 41, 50–54 and Ex. 4.

28. *Id.* at 38, 63, 74–75.

29. *Id.* at 38, 60–63.

30. *Id.* at 34–35.

31. *Id.* at 36–37, 51.

32. Underwood deposition at 80.

33. Elmore deposition at 68; Banks deposition at 26–27; Attachments to plaintiff's response to defendants' motion for summary judgment, filed April 29, 1999, deposition of Gail Bimbo at 36, 75–77.

34. Banks deposition at 26–27.

35. Elmore deposition at 71.

36. Underwood deposition at 77–78; Banks deposition at 27.

37. Underwood deposition at 160.

ing of employees, but no disciplining.[38] Underwood took the instruction to mean that she could not even engage in informal counseling.[39]

After Underwood's demotion, Banks called a meeting of a group of white employees to discuss the "racial tension" in the office.[40] According to employee Cathy Ruff, he told them that "if the [racial tension] problem did not die down, Sheila [Underwood] would be fired and all of our jobs would be in jeopardy."[41]

Underwood continued to experience hostility after her demotion. As she walked by the group of nurses on the front hall, she heard someone say, "See, we're going to be here forever. We can bring any white supervisor down any time we want to."[42] Underwood does not know the identity of the speaker. Betty Ponds, one of the front hall nurses, accused Underwood of staring at her in the lunch room. A nursing assistant told her that two African–American nursing assistants said they were going to get "that blonde bitch ... out of this facility."[43]

Sometime after the demotion, Hatten asked Underwood whether she would consider moving to the front hall. Hatten explained that she was hiring another registered nurse and wanted to place her as RN Unit Manager on the back hall. Underwood asked why she wanted her to move; Hatten explained that she did not think Underwood "was disciplining enough on the back hall."[44] Underwood informed Hatten that she had been told by Bimbo, Elmore, and Thompson not to discipline anyone and that it was now Hatten's job to do so. Hatten's reply was "one person

can't do it all." Underwood then told Hatten that she "preferred not to go on the front hall ... [because] she felt that those were the employees that had taken action against [her]."[45] Hatten did not transfer her at that time.

Nevertheless, on December 31, 1997, Hatten informed Underwood that she would be reassigned from RN Unit Manager on the back hall to RN Unit Manager on the front hall.[46] Hatten said that, although she knew that Underwood had told her before that she preferred not to go to the front hall, "this time [Underwood] had no choice."[47] Underwood worked the following day, January 1, 1998, on the back hall and was off from work the day after. She wrote her resignation letter over the weekend of January 3–4, 1998, and submitted it to Banks on Monday, January 5, 1998.[48] She did not protest Hatten's decision to her superiors before submitting her letter.

## III. DISCUSSION

Underwood contends that she suffered a racially discriminatory demotion, a hostile work environment, and constructive discharge. The court will analyze each claim in turn.

### A. Discriminatory Demotion

 To prove a case of discrimination, a plaintiff may present either direct evidence of discriminatory intent, manifested by the discriminatory actions or remarks of his employer, or use the factors set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36

---

38. *Id.* at 161.

39. *Id.*

40. Attachments to plaintiff's response to defendants' motion for summary judgment, filed April 29, 1999, affidavit of Cathy Ruff (hereafter "Ruff affidavit") at 2.

41. *Id.*

42. Underwood deposition at 130–31.

43. *Id.* at 123.

44. *Id.* at 163.

45. *Id.* at 163.

46. *Id.* at 163–64.

47. *Id.* at 164.

48. *Id.* at 163–65.

L.Ed.2d 668 (1973), to raise, by indirect or circumstantial evidence, an inference of discrimination. *See Hill v. Metropolitan Atlanta Rapid Transit Authority,* 841 F.2d 1533, 1538 (11th Cir.1988); *see also Turnes v. AmSouth Bank, NA,* 36 F.3d 1057, 1060–1061 (11th Cir.1994); *Howard v. BP Oil Co.,* 32 F.3d 520, 524 n. 2 (11th Cir.1994). The burdens imposed on the parties differ depending on which method is employed. If the plaintiff succeeds in presenting direct evidence that discrimination "played a significant or substantial role in the employment decision, the burden shifts to the employer to show that the decision would have been the same absent discrimination." *Eskra v. Provident Life & Acc. Ins. Co.,* 125 F.3d 1406, 1411 (11th Cir.1997). If, however, no direct evidence of discrimination is shown, and the plaintiff must rely upon circumstantial evidence, she retains the ultimate burden of proving that she was the victim of intentional discrimination. *See Evans v. McClain of Georgia, Inc.,* 131 F.3d 957, 963 (11th Cir. 1997). Underwood contends that she has presented sufficient direct evidence to withstand summary judgment. As explained below, the court finds that Underwood has presented some direct evidence of discrimination. The court also concludes that Underwood has provided sufficient circumstantial evidence to withstand summary judgment.

### 1. Direct Evidence

■ "Direct evidence is evidence that establishes the existence of discriminatory intent behind the employment decision without any inference or presumption." *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998) (citations omitted). Therefore, discriminatory remarks by the decision-maker in a challenged employment decision can of course constitute direct evidence of discrimination. *See Za-*

*ben v. Air Products & Chemicals, Inc.,* 129 F.3d 1453, 1456 (11th Cir.1997). However, the plaintiff cannot rely on remarks as direct evidence of discrimination unless they were uttered by the decision-maker in the challenged action, or, at the very least, by a person somehow involved in, or having an influence on, the decisional process. *See Holifield v. Reno,* 115 F.3d 1555, 1563–64 (11th Cir.1997) ("The biases of one who neither makes nor influences the challenged personnel decision are not probative in an employment discrimination case."); *Trotter v. Bd. of Trustees of Univ. of Ala.,* 91 F.3d 1449, 1453–54 (11th Cir. 1996) ("For statements of discriminatory intent to constitute direct evidence of discrimination, they must be made by a person involved in the challenged action."); *see also Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 1804, 104 L.Ed.2d 268 (1989) (O'Connor, J., concurring) ("stray remarks in the workplace ..., statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" do not constitute direct evidence of discrimination). Furthermore, where "differing inferences ... may be drawn from [a] statement[ ]," and one inference does not support discrimination, the statement does not constitute direct evidence of discrimination. *Schoenfeld v. Babbitt,* 168 F.3d 1257, 1267 (11th Cir.1999).[49]

Underwood argues that the following evidence constitutes direct evidence of discrimination:

■ • In her affidavit, Underwood attests that when she spoke to Banks on the night of November 11, 1997, and he told her that her demotion "was based solely on race and [th]at there were no legitimate complaints about ... [her] perfor-

---

49. In *Hearn v. General Electric Co.,* 927 F.Supp. 1486, 1497–98 (M.D.Ala.1996) (Thompson, J.), this court expounded at length on the murkiness of the Eleventh Circuit's direct-evidence definition and, in addi-

tion, on the needlessness and implausibility of the distinction between direct and circumstantial evidence. Nevertheless, because this court is bound by this circuit's precedent, it will continue to draw the distinction.

mance." [50] This comment could be read in one of two ways: first, that he, Elmore, and Bimbo decided to demote Underwood based on her race; or, second, that Banks knew that the complaints which formed the basis for the decision to demote her were racially motivated.[51] Read in either way, the sentence clearly suggests that the decision to demote Underwood was motivated, directly or indirectly, by her race. Furthermore, the record indicates that Banks was involved in the decision-making process. Therefore, the court concludes that Bank's statement is direct evidence of discrimination.

■ ● On the day after her demotion, Underwood had a conversation with Elmore which Underwood described in her affidavit as follows:

> "She assured me that my demotion had nothing to do with my work performance, that she had not heard any negative comments about my work performance, and that the demotion was based on my race. She told me that she had met the day before with 12 employees (2 of whom were white) and they accused me of racial prejudice. She assured me that she did not believe I was prejudiced but that was the reason for my demotion." [52]

The court finds that Elmore's statement does not constitute direct evidence of discrimination because it could be interpreted in more than one way. While the first sentence, looked at in isolation, could be taken to suggest that Underwood was demoted on account of her race, when looked at in the context of the entire paragraph, Elmore's statement could also be interpreted as showing that Underwood was demoted because of accusations of her own racism. Demotion of an employee based on evidence of the employee's own racism, however, does not violate Title VII. Therefore, although it certainly constitutes circumstantial evidence, Elmore's statement is not direct evidence of racial discrimination.

■ ● Underwood has also presented an affidavit by employee Cathy Ruff attesting that after Underwood was demoted, Banks called a meeting with certain white employees to discuss "racial tension" in the office.[53] At that meeting, Ruff reports, "He told us that if the problem did not die down, Sheila would be fired and all of our jobs would be in jeopardy. Jason [Banks] said that it was a 'black and white issue' (meaning it was based on race) ...." [54] This statement is not direct evidence of discrimination in the demotion decision because it is unclear that the word "it" refers to Underwood's demotion and because, even assuming that "it" refers to the demotion, the phrase 'black and white issue' does not indicate whether Underwood was demoted because of her race or because of perceived racism on her part. Ruff also states that she "understood [from Banks] that Sheila had been demoted because of her race." [55] This statement provides no direct evidence of discrimination because Ruff does not indicate whether Banks stated that Underwood was demoted on account of her race or whether Ruff reached that conclusion herself.

● Underwood argues that transcripts of tape-recorded telephone conversations on December 2 and 3, 1997, between herself and Northport Regional Nurse Consultant Sarah Thompson, Banks, and Bimbo sup-

---

**50.** Attachments to plaintiff's response to defendants' motion for summary judgment, filed April 29, 1999, affidavit of Sheila Underwood (hereafter "Underwood affidavit") at 2.

**51.** This reading of the sentence is supported by Underwood's deposition testimony, in which she recounts Banks telling her in regards to the demotion: "[I]t is strictly race. You are white and they want you out and they want Johnnie Mae in because she's black." Underwood deposition at 124.

**52.** Underwood affidavit at 2.

**53.** Ruff affidavit at 2.

**54.** *Id.*

**55.** *Id.*

ply direct evidence that Underwood was demoted on account of race. Underwood does not point out any specific statements in these transcripts that constitute direct evidence of discrimination, and the court has found none in its own review of the transcripts.

As stated above, the court concludes that Banks's statement to Underwood constitutes direct evidence of discrimination. "Where the non-movant presents direct evidence [of discrimination] that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir.1997) (citing *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir.1996)). *See also Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 641 (11th Cir.1998). It is questionable whether Banks's statement alone would be sufficient to sustain a jury verdict. However, the court need not decide this question because it finds that Underwood has presented sufficient circumstantial evidence of racial discrimination to survive summary judgment on her demotion claim.

### 2. Circumstantial Evidence

■ When a plaintiff seeks to prove discrimination through circumstantial evidence, her claims must be analyzed under the Supreme Court's burden-shifting framework for the presentation of proof in Title–VII discrimination cases, as set out in *McDonnell Douglas*. Under this approach, an employee has the initial burden of proving a prima-facie case of unlawful discrimination by a preponderance of the evidence. 411 U.S. at 802, 93 S.Ct. at 1824. Many different articulations of the prima-facie case exist, varying with the context of the employment decisions at issue and the types of proscribed practices involved. The essence of the prima-facie case is that the employee presents circumstantial evidence sufficient to generate a reasonable inference by the fact-finder that the employer used prohibited criteria in making an adverse decision about the employee. If established, the prima-facie case raises a presumption that the employer is liable to the employee. *See id.; Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ Once the plaintiff has established a prima-facie case, the defendant must rebut the presumption of discrimination established by the prima-facie case by producing sufficient evidence to raise a genuine issue of fact as to whether the employer took unlawful actions against the employee, a burden that can be met by articulating a legitimate, nondiscriminatory reason for the challenged employment action. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). The rebuttal burden is one of production only, and the employer does not have to persuade the court that it was actually motivated by the proffered reason. *See Burdine*, 450 U.S. at 253–55, 101 S.Ct. at 1093–94.

■ If the employer satisfies this burden, "the presumption of discrimination created by the *McDonnell Douglas* framework 'drops from the case,' and 'the factual inquiry proceeds to a new level of specificity.'" *Combs*, 106 F.3d at 1528 (quoting *Burdine*, 450 U.S. at 255 & n. 10, 101 S.Ct. at 1094–95 & n. 10). Specifically, the burden again shifts to the plaintiff to show that the proffered reason is a pretext for the true discriminatory reason. The Supreme Court has explained that the plaintiff may successfully demonstrate that the employer's proffered reasons are pretextual by means of either of two alternative approaches. The plaintiff may establish pretext directly, "by persuading the court that a discriminatory reason more likely motivated the employer," or she may do so indirectly, "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

To establish a prima-facie case of discriminatory demotion, the plaintiff must show that she (1) is a member of a protected group, (2) was qualified for the position she occupied, (3) was demoted, and (4) was replaced by someone of comparable qualifications not a member of her protected class. *See Sturniolo v. Sheaffer, Eaton, Inc.*, 15 F.3d 1023, 1025 (11th Cir.1994) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824).[56] With regards to her qualifications for the position, the plaintiff need only show that she was presumptively qualified by, for example, training or experience. *See Walker v. Mortham*, 158 F.3d 1177, 1189 (11th Cir.1998) (discussing with approval *East v. Romine, Inc.*, 518 F.2d 332 (5th Cir.1975) (in discriminatory failure-to-hire case, welder needed to show only that she was "presumptively qualified on the basis of an application which showed a long history of welding work" to meet qualifications prong of prima-facie case), *overruled on other grounds by Burdine v. Texas Dept. of Community Affairs*, 647 F.2d 513, 514 (5th Cir.1981)).

Underwood has presented evidence sufficient to establish a prima-facie case. She is white, which is a protected class under Title VII. The record reveals that she was qualified for the Director of Nursing position by virtue of her training as a nurse and years of experience as an Assistant Director of Nursing for Northport. Finally, she was demoted and replaced by an African–American person of comparable qualifications.

Because Underwood has presented a prima-facie case of discriminatory demotion, as noted above, the burden shifts to the defendants to provide a nondiscriminatory reason for the demotion. The defendants have met this burden by arguing that they demoted Underwood because of a lack of managerial skills and resulting complaints from employees. Therefore, Underwood must provide evidence showing that this proffered justification is pretextual.

Underwood has presented significant circumstantial evidence suggesting that she was actually demoted on account of race. First, she has presented the evidence comprising her prima-facie case, which the court may consider in determining whether the plaintiff has met the burden of demonstrating pretext. *See Combs*, 106 F.3d at 1528–30. Second, she has presented the direct evidence discussed above. Third, she has presented the statements of Elmore and Banks which the court determined were not direct evidence of discrimination. Taken in the light most favorable to Underwood, these statements—Elmore's statement that Underwood was demoted "based on race" and Banks's statement to the group of white employees that Underwood's and the other white staffs jobs were in jeopardy because of a "black and white issue"—constitute circumstantial evidence that Underwood was demoted because of her race.

Underwood has also presented substantial evidence indicating that she was not demoted on account of job performance, including Elmore's and Banks's comments to that effect, and a statement by Bimbo that the demotion "doesn't have anything

---

**56.** Although *Sturniolo* requires the plaintiff to prove that the person who replaced her had comparable qualifications, the Eleventh Circuit's decision in *Walker v. Mortham*, 158 F.3d 1177 (11th Cir.1998), casts doubt on whether the plaintiff in a discriminatory-demotion case must prove comparable qualifications as part of the prima-facie case. In that case, the Eleventh Circuit rejected a formulation of the prima-facie case for a discriminatory failure to hire that included relative qualifications at the prima-facie case stage. The court observed that "comparative evidence lies at the heart of a rebuttal of a prima facie case of employment discrimination", *id.* at 1190, and held that the Supreme Court's decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), prohibits the court from requiring a plaintiff to prove equal qualifications at the prima-facie stage.

to do with job performance."[57] In addition, Underwood has presented evidence that, during a conversation between her and Banks in which they were discussing her demotion and in which Underwood told Banks that other staff people were worried that "what happened to [her] could happen to them,"[58] Banks's response was: "it's really just the administrator and the [Director of Nursing] position[;] those are the only two that will ever be subject to something like that[.] ... [A]s far as ... the other department heads[,] ... it's based strictly on how well they do or how well they don't do."[59] Taken in the light most favorable to Underwood, this statement clearly suggests that Underwood's demotion was not based on her job performance.

In sum, Underwood has presented substantial evidence that she was not demoted for poor job performance. Such evidence, of course, does not necessarily lead to the conclusion that she was demoted because she is white. It does, however, support that conclusion. Had Underwood behaved in a racially discriminatory manner, such behavior presumably would have adversely affected her employers' assessment of her job performance. Therefore, the evidence that her demotion was not based on job performance, when considered in conjunction with the various statements suggesting that she was demoted because of "race," strengthens her claim that she was demoted because she is white.

Finally, Underwood has provided evidence suggesting that the defendants demoted her because they feared having a white person discipline African–American employees. In a conversation about her demotion, Bimbo told Underwood that Hatten "has a better chance of getting rid of those that are not doing their job than you did because she's black. And that's bad to say but it's true. You know Sandra [Boykin] could have."[60] This statement, taken in the light most favorable to Underwood, suggests that she may have been demoted because her race impeded her in effectively disciplining African–American employees.

Because Underwood has presented sufficient evidence to establish a genuine issue of material fact as to whether she was demoted on account of race, the court will deny summary judgment on her demotion claim.

**B. Hostile Work Environment**

 Underwood contends that she was subjected to a hostile work environment. To prove a prima-facie case of hostile-work-environment harassment under Title VII, the plaintiff must show that: (1) she is a member of a protected group; (2) she was subjected to unwelcome conduct; (3) the conduct was on the basis of race; (4) the conduct affected a term or condition of employment; and (5) imposition of liability on the defendant is appropriate. *See Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir.1982). It is undisputed that Underwood is a member of a protected group and that the conduct she experienced was unwelcome. The defendants argue that Underwood cannot show that the alleged harassment was based on race or that it affected a term or condition of employment.

---

57. Attachments to plaintiff's response to defendants' motion for summary judgment, filed April 29, 1999, transcript of conversation with Gail Bimbo on December 3, 1996, at 12. The record also contains evidence that Sarah Thompson, a Regional Nurse Consultant for Northport, told Underwood that her demotion was not on account of job performance. However, it is unclear whether Thompson had any personal knowledge of the reasons for the demotion.

58. Attachments to plaintiff's response to defendants' motion for summary judgment, filed April 29, 1999, transcript of conversation with Jason Banks on December, 2, 1997, at 5.

59. *Id.*

60. Attachments to plaintiff's response to defendants' motion for summary judgment, filed April 29, 1999, transcript of conversation with Gail Bimbo on December 3, 1997, at 16.

### 1. Based on Race

As mentioned above, to prove a prima-facie case of harassment, Underwood must present evidence suggesting that the alleged harassment was based on race. The court concludes that Underwood has produced sufficient evidence for a jury to conclude that the front-hall nurses harassed her on account of her race.

The record clearly indicates a causal connection between Boykin's demotion and forced resignation and the front-hall nurses' maltreatment of Underwood. The alleged harassment began when Boykin was demoted and worsened when she left Northport. Furthermore, Underwood testified that front-hall nurse Peterson expressed concern that Underwood "would get rid of her the way she had gotten rid of Boykin." [61] Considered alone, this evidence, of course, is insufficient to prove that the front-hall nurses harassed Underwood because she was white, rather than because they blamed her for Boykin's departure. However, other evidence suggests that their retaliatory conduct was at least partly motivated by race.

First, Underwood has presented evidence that the front-hall nurses were rude not only to her, but also to other white staff. Both Ruff and Causey attested that the front-hall nurses treated white staff members with hostility. The front-hall nurses presumably did not hold all white staff equally responsible for Boykin's departure as Underwood, who actually filled Boykin's position. Therefore, the front-hall nurses' hostility towards other white staff suggests that they mistreated Underwood not only because she replaced Boykin but also because of her race.

In addition, Underwood has produced statements by the front-hall nurses indicating racial animus. First, Ingram, whom Underwood testified appeared to be the leader of the front-hall nurses, said that all white people are "low life." Second, Underwood heard a statement sug-gesting that the front-hall nurses had complained about her to get her demoted on account of race. After she was demoted, Underwood, while walking past the front-hall nurses, heard a nurse say behind her back, "We can bring any white supervisor down any time we want to." The court, of course, cannot consider this statement as evidence that the nurses actually are capable of ruining the careers of white supervisors: it can, however, consider the statement as circumstantial evidence that the speaker, a front-hall nurse, took responsibility for Underwood's demotion and was motivated by race in seeking Underwood's demotion. The anonymity of the speaker does not destroy the probative value of the statement: given the evidence that the front-hall nurses acted as a group, the court can consider the statement as evidence of the group's motivation.

In short, Underwood has presented evidence that, when considered as a whole and in the light most favorable to Underwood, suggests that she was harassed on account of race.

### 2. Affected Conditions of Employment

 To prove a prima-facie case of harassment, Underwood must also establish that the alleged harassment was "sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Henson*, 682 F.2d at 904; *see also Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993) ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated.") (internal citations omitted). "In deciding whether a hostile environment was created, factors to consider include the frequency of the discriminatory conduct, the severity of the discriminatory conduct, whether the conduct is threatening or humiliating, and whether

---

**61.** *Id.* at 106.

the conduct unreasonably interferes with the plaintiff's performance at work." *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521–22 (11th Cir.1995) (citation omitted). "A plaintiff may have a viable hostile-environment claim even if the racial remarks were not directed at her." *Id.*

Underwood has brought forward evidence that the front-hall nurses were rude to her, made unpleasant comments about her, laughed at her behind her back, looked at her in a hostile manner, and complained to her superiors about her. Underwood also has testified that, on at least two occasions, they leveled baseless accusations of racism at her.

It could also be reasonably argued that the circumstances surrounding her demotion—including being ordered not to discipline anyone, forced to work under her former subordinates, and asked to work directly with the front-hall nurses who were harassing her—constituted racial harassment as well. It appears, however, that Underwood is not making that claim here. Nevertheless, the circumstances surrounding the demotion form part of the totality of the circumstances and reinforce the conclusion that the harassment was severe and pervasive.[62]

▮ Applying the relevant factors, the court finds that the alleged harassment was severe and pervasive enough to alter the terms and conditions of Underwood's employment. The conduct was frequent; Underwood interacted with the front-hall nurses every day and they were constantly rude to her. Although it was not physically threatening, the harassment did threaten Underwood's job security and made work extremely unpleasant. It also was severe and humiliating in that, as a result of the harassment, Underwood was demoted, forced to work under her former subordinates, and prevented from disciplining them for harassing conduct. Under these circumstances, a reasonable jury could conclude that the alleged harassment was severe and pervasive enough to violate Title VII.

### 3. Employer Liability

▮ To complete her prima-facie case, Underwood must also show that imposition of liability on the defendants is appropriate. The Supreme Court has explicitly held that an employer may not be held "automatically liable" for all sexual harassment inflicted, or suffered, by its employees. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). Lower courts must consider the circumstances of each particular case before imposing liability. *See id.* The standard governing imposition of liability depends on the position of the alleged harasser relative to the plaintiff. Where the harasser is a supervisor with immediate or successively higher authority over the plaintiff, the employer is vicariously liable for the supervisor's harassment, subject to certain affirmative defenses. *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). In contrast, where the person who engaged in the unlawful conduct is not the plaintiff's supervisor but rather is one of the plaintiff's co-workers or a supervisor with no authority over the plaintiff, the plaintiff must show under the theory of respondeat superior that the employer "knew or should have known of the harassment in question and failed to take prompt remedial action." *Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1557, 1558 n. 4 (11th Cir.1987) (quoting *Henson*, 682 F.2d at 905). A plaintiff can prove that the employer knew of the harassment by showing that the harassment was open or pervasive enough to charge the employer with constructive knowledge. *See Vance v. Southern Bell*

---

62. It could be argued that, to the extent that the demotion could be analyzed as racial harassment, it essentially would be a restatement of Underwood's discriminatory-demotion claim.

*Tel. and Tel. Co.*, 863 F.2d 1503, 1512 (11th Cir.1989), *cert. denied*, 513 U.S. 1155, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995). A plaintiff may also prove an employer's knowledge by showing that she complained to higher management. *See Huddleston v. Roger Dean Chevrolet, Inc.*, 845 F.2d 900, 904 (11th Cir.1988).

The courts have not addressed what standard of liability applies where, as in this case, a plaintiff claims to have been harassed by her subordinates. Because the principles relied upon in *Faragher* and *Ellerth* do not apply to a person in a subordinate position, and because a subordinate is more akin to a co-worker than to a supervisor, the court believes that application of the respondeat-superior liability is appropriate. *See Cronin v. United Service Stations, Inc.*, 809 F.Supp. 922, 928–29 (M.D.Ala.1992) (Thompson, J.) (applying respondeat-superior liability to alleged harassment by a subordinate).

Underwood has made the required showing for imposition of respondeat-superior liability. The record indicates that Administrator Banks not only was aware of the harassment himself, but also reported it to Human Resources Director Elmore. There is also evidence that Underwood complained about the harassment to Bimbo. Yet there is no evidence that Elmore, Banks, or Bimbo adequately investigated the harassment or ordered the front-hall nurses to stop harassing Underwood. Bimbo claims to have investigated a complaint from Underwood that nursing assistant Ingram was harassing her. However, Bimbo does not remember whom she talked to about the complaint or what she asked them.[63] Given the absence of any information about the depth or scope of the investigation, the court cannot conclude that it was sufficient to relieve the defendants of liability.

**63.** Bimbo Deposition at 39–40.

**64.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding prece-

In short, Underwood has established the existence of a genuine issue of material fact as to all of the required elements of her claim of hostile-work-environment racial harassment. Accordingly, the court will deny summary judgment on the claim.

C. Constructive Discharge

A plaintiff succeeds in establishing a constructive-discharge claim when the alleged discriminatory conduct "was so intolerable that a reasonable person in [her] position would be compelled to resign." *Morgan v. Ford*, 6 F.3d 750, 755–56 (11th Cir.1993), *cert. denied*, 512 U.S. 1221, 114 S.Ct. 2708, 129 L.Ed.2d 836 (1994) (citations omitted). *See also Hill v. Winn–Dixie Stores, Inc.*, 934 F.2d 1518, 1527 (11th Cir.1991). Part of the reasonableness requirement is "an obligation not to assume the worst, and not to jump to conclusions too fast." *Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987). Therefore, courts generally will not find constructive discharge unless the employer has been given sufficient time to remedy the allegedly intolerable situation. *See id.; Bourque v. Powell Electrical Mfg. Co.*, 617 F.2d 61, 65 (5th Cir.1980).[64]

Underwood contends that the hostile work environment and demotion created a situation so intolerable that she was compelled to resign. The defendants contend that Underwood's resignation was precipitated by Hatten's decision to transfer her to the front hall and that Underwood's failure to seek review of Hatten's decision from her superiors before resigning precludes Underwood from claiming constructive discharge. Underwood does not contest that Hatten's transfer decision was the immediate impetus for her resignation or that she did not protest the transfer to any of Hatten's superiors prior to resigning. Instead, Underwood argues that she would have quit regardless of the

dent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

transfer and that the defendants had already had ample time to remedy the harassment by the time she submitted her resignation.

The record reveals that on December 22, 1997, Underwood told Regional Manager Bimbo and Regional Nurse Consultant Thompson that she intended to resign the following week because of the harassment and because of her fear that the front-hall nurses might 'set her up' for termination, thereby threatening her nursing career.[65] Underwood explained that she believed that the front-hall nurses had 'set up' another nurse, who was then fired as a result. The record also indicates that Underwood agreed to Bimbo's request that she not resign until after Bimbo had investigated the worsening conditions, and that Underwood knew that Bimbo would not be able to conduct any investigation until after returning from vacation on January 5, 1998. Given Underwood's promise to stay until Bimbo investigated the conditions, the court must conclude that her decision to resign was precipitated by Hatten's decision to transfer her, not merely by the harassment.

The question therefore becomes whether Underwood should have challenged the transfer decision by complaining to Hatten's superiors before resigning. Where the evidence shows that the plaintiff reasonably believed that complaining about the decision would be futile, imposing a complaint requirement would be nonsensical. However, Underwood has not come forward with evidence sufficient to support such a conclusion. Hatten's stated rationale for transferring Underwood was to obtain her assistance in disciplining the front-hall nurses. However, Elmore had instructed Underwood not to discipline any employees. Given that Hatten's decision directly conflicted with Elmore's directive, it was distinctly possible that Elmore would have overridden Hatten's decision,

and it was therefore unreasonable for Underwood not to seek review of the decision by Elmore. Furthermore, Bimbo had promised to address Underwood's concerns when she returned from vacation. A reasonable employee would have given her the opportunity to do so. Finally, there is no evidence that Underwood decided not to complain because she believed that complaining would be of no use. Instead, the record indicates that Underwood had complained only a week earlier and agreed not to resign immediately because of Bimbo's promise to investigate, and that she ultimately decided to resign because she could not face even one day working closely with the front-hall nurses. Although the court finds Underwood's fear of working on the front hall understandable, it cannot conclude that it was reasonable under the applicable case law.

Accordingly, it is ORDERED that the motion for summary judgment filed by the defendants Northport Health Services, Inc., and Tallassee Healthcare Facility on April 7, 1999, is granted as to plaintiff Sheila Underwood's constructive-discharge claim and is denied in all other respects.

---

**65.** Attachments to plaintiff's response to defendants' motion for summary judgment, filed April 29, 1999, transcript of December 22, 1997, conversation with Gail Bimbo, and transcript of December 22, 1997, conversation with Sarah Thompson.